### UNITED STATES v. ATLANTA JOURNAL CO. et al.

(Circuit Court, N. D. Georgia. January 30, 1911.)

1. CONSPIRACY (§ 33*)—DEFRAUDING UNITED STATES.

     A scheme whereby the publishers of a newspaper attempt to procure the special rate of postage to publishers of one cent a pound, instead of the transient rate of four cents a pound, by deceiving the post office employés as to the circulation of the paper, does not constitute a conspiracy to defraud the United States where the paper is entitled under the law to the one cent a pound rate for its entire issue.

     [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. § 33.*]

2. CONSPIRACY (§ 43*)—PROSECUTION—INDICTMENT—SUFFICIENCY.

     Under Act Cong. March 3, 1879, c. 180, §§ 10, 11, 14, 20 Stat. 359 (U. S. Comp. St. 1901, pp. 2646, 2647), defining second-class mail matter, and fixing the rate of postage on publications of the second class, when sent from the office of publication, including sample copies, or when sent from

---

a news agency to actual subscribers thereto, at two cents per pound or fraction thereof, provided that nothing in the statute shall be construed so as to admit to the second-class rate regular publications designed primarily for advertising purposes, for free circulation, or for circulation at nominal rates, Act Cong. March 3, 1885, c. 342, 23 Stat. 387 (U. S. Comp. St. 1901, p. 2669), changing the rate to one cent per pound, and Act Cong. June 9, 1884, c. 73, 23 Stat. 40 (U. S. Comp. St. 1901, p. 2669), fixing the rate on periodicals of the second class when sent by others than the publishers or news agents at one cent for each four ounces or fractional part thereof, an indictment for conspiracy to defraud the United States by securing for papers sent out in addition to the regular circulation the one cent a pound rate instead of the one cent for four ounces rate is insufficient, where it does not allege that the papers were designed primarily for advertising purposes or for free circulation or for circulation at nominal rates.

[Ed. Note.—For other cases, see Conspiracy, Dec. Dig. § 43.*]

**3.** Post Office (§ 15*)—Rate of Postage—Second-Class Matter.

Under Act Cong. March 3, 1879, c. 180, §§ 10, 11, 14, 20 Stat. 359 (U. S. Comp. St. 1901, pp. 2646, 2647), Act March 3, 1885, c. 342, § 1, 23 Stat. 387 (U. S. Comp. St. 1901, p. 2669), and Act June 9, 1884, c. 73, 23 Stat. 40 (U. S. Comp. St. 1901, p. 2669), fixing the rate of postage of publications of the second class sent by the publisher from the office of publication, including sample copies or when sent from a news agency to actual subscribers, at one cent per pound, provided that publications designed primarily for advertising purposes or for free circulation or for circulation at nominal rates shall not be admitted to the second-class rate, and fixing the rate on publications of the second class sent by others than publishers or news agents at one cent for four ounces or fractional part thereof, a newspaper otherwise entitled to be admitted to the second class would violate the law by mailing under the second-class rate only where the papers mailed are designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 22; Dec. Dig. § 15.*]

**4.** Indictment and Information (§ 71*)—Sufficiency—Certainty.

An indictment under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), making it an offense to conspire either to commit any offense against the United States or to defraud the United States, must charge the act constituting the offense with reasonable certainty, and not by mere inference.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 193; Dec. Dig. § 71.*]

Indictment against the Atlanta Journal Company and others for conspiracy. Heard on demurrer. Sustained.

Alexander Akerman, Special Asst. to the Atty. Gen., F. C. Tate, U. S. Atty., and Jno. W. Henley, Asst. U. S. Atty., for the Government.

King & Spalding and John L. Hopkins & Sons, for the defendant.

NEWMAN, District Judge. The indictment in this case charges a conspiracy against the Atlanta Journal Company, James R. Gray, John D. Simmons, C. B. Babb, and V. P. Harper; the conspiracy being to defraud the United States of postage on a newspaper called the "Atlanta Semi-Weekly Journal."

The indictment sets out: That this publication had been entered at the United States post office at Atlanta, Ga., as mail matter of the

second class, and that it was permitted by the postal laws and regulations to mail and have transmitted through the mails, sample copies of the Semi-Weekly Journal to divers persons not subscribers for the purpose of inducing them to become subscribers for, advertise in, or become agents therefor to the extent of 10 per centum of the total weight of copies mailed to subscribers during the calendar year at the second-class postage rate of one cent per pound, but it was required by the postal laws and regulations to pay to the United States on all copies of its publication in excess of 10 per centum of the total weight of copies mailed to subscribers during the year the transient second-class postage rate of one cent for each four ounces or fraction thereof. That on the 1st of October, 1898, the Atlanta Journal Company, the publisher of the Semi-Weekly Journal, had already exhausted its sample copy privilege for the year 1898 based on their probable mailing list of subscribers during the year, and it is charged a conspiracy was entered into to defraud the United States of divers large sums of money, the amount being to the grand jurors unknown, the difference between the transient second-class rate of one cent for each four ounces or fraction thereof and the regular second-class rate of one cent per pound, upon large quantities of the said Semi-Weekly Journal, by means of a fraudulent scheme devised by the defendants.

It is first charged the fraudulent scheme contemplated that large quantities of the Semi-Weekly Journal should be wrapped and addressed to divers persons who were not subscribers, without marking the same "sample copies," in order to deceive the employés of the Post Office Department as to the true nature of said copies, and the true amount of postage due the United States, and mailed and caused to be mailed and transmitted through the United States mails. It is then charged that the fraudulent scheme further contemplated for the purpose of deceiving any agent of the Post Office Department who might be sent to investigate the circulation of the Semi-Weekly Journal, when they intended to cause large quantities of copies of the Semi-Weekly Journal to be wrapped, addressed, mailed, and transmitted to persons not subscribers, caused to be entered in a book kept by the Atlanta Journal Company and known as the "Circulation Record" of the Semi-Weekly Journal figures indicating that at such times the said Semi-Weekly Journal had received large numbers of new subscribers, when in truth and in fact no such new subscriptions had been received, and, when the next issue of the Semi-Weekly Journal was to be published, the defendants would cause to be entered in the aforesaid book figures indicating that large numbers of subscriptions had been discontinued in order to reduce the figures shown on said book to the real number of subscribers to the Semi-Weekly Journal. Certain overt acts are then set out which would seem to be sufficient if a conspiracy to defraud the United States had been charged.

To this indictment a demurrer upon several grounds has been filed; the principal grounds being: First. That the facts set forth in the indictment do not show the commission by the defendants, or either of them, of the offense of conspiring to defraud the United States government. Second. That the facts set forth in the indictment do not show the commission of any offense by the defendants, or either of

them, against the laws of the United States. Third. That the indictment does not charge any offense against the laws of the United States, or a violation of any law, or the conspiring to do anything forbidden by the laws of the United States, but couples therewith the allegation that the same is forbidden by the postal regulations of the United States. Fourth. That it is no criminal offense to violate a postal regulation. Fifth. That, under the statutes of the United States, there is no restriction upon the number of sample copies that can be mailed by a publisher at the rate of one cent per pound. Sixth. That under the laws of the United States the publisher of a newspaper is permitted to mail and send through the mails, as second-class matter, any amount of his second-class mail publication, including any amount of sample copies. Seventh. That the acts set out and things alleged to have been committed were lawful and authorized by the statutes of Congress in such behalf made and provided, and that the defendants, and each of them, in performing such acts, have done only that which they were fully authorized by law to do.

That portion of the indictment which might seem to charge that the conspiracy and the scheme to defraud was to get sample copies into the mail in excess of the 10 per centum allowed by the postal regulations is not insisted upon as a distinct charge here by the attorneys for the government, but was stated by them in open court to be set out simply as a matter of inducement, and that the real charge is of a conspiracy and a scheme to defraud the United States by sending copies through the mails not to regular subscribers and by using what are called "Circulation Books," referred to in the indictment, for the purpose of deceiving the employés of the Postal Department as to that fact.

It is conceded by the counsel for the government that if the copies of the Semi-Weekly Journal which the defendant contemplated mailing, and it is charged they did actually mail, in furtherance of the conspiracy and of the scheme to defraud, were entitled to admission to the mails at what may be called the pound rate—that is, one cent per pound—instead of one cent for every four ounces, then the government could not have been defrauded, and no case would be made by this indictment. So the whole question for determination here depends upon whether under the facts alleged in the indictment the papers which it was proposed to mail were entitled to admission at the one cent per pound rate.

There are three acts of Congress which are material here. The first is Act March 3, 1879, c. 180, 20 Stat. 359 (Vol. 1, Rev. St. Supp. p. 455 [U. S. Comp. St. 1901, pp. 2646, 2647]). That act is in these words:

"Sec. 10. That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals and as frequently as four times a year and are within the conditions named in sections twelve and fourteen.

"Sec. 11. Publications of the second class, except as provided in section twenty-five, when sent by the publisher thereof, and from the office of publication, including sample copies, or when sent from a news agency to actual subscribers thereto, or to other news agents shall be entitled to transmission

through the mails at two cents per pound or a fraction thereof, such postage to be prepaid, as now provided by law."

"Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

"First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively.

"Second. It must be issued from a known office of publication.

"Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications.

"Fourth. It must be originated and published for the dissemination of information of a public character or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers:

"Provided, however, that nothing herein contained shall be so construed as to admit to the second class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

Subsequently in the act of Congress approved March 3, 1885 (23 Stat. 387 [U. S. Comp. St. 1901, p. 2669]), it was enacted:

"That all publications of the second class, except as provided in section twenty-five of said act, when sent by the publisher thereof, and from the office of publication, including sample copies, or when sent from a news agency to actual subscribers thereto, or to other news agents, shall on and after July 1st, 1885, be entitled to transmission through the mails at one cent a pound or fraction thereof, such postage to be prepaid as now provided by law."

In the act of Congress approved June 9, 1884 (23 Stat. 40 [U. S. Comp. St. 1901, p. 2669]), there is this provision:

"That the rate of postage on newspapers and periodical publications of the second class, when sent by others than the publishers or news agents shall be one cent for each four ounces or fractional part thereof, and shall be fully prepaid by postage stamps affixed to said matter."

These three acts, so far as I am aware, are the only laws—that is, the only acts of Congress—material to the question involved here. It will be seen that the only substantial difference between the act of 1879 and that of 1885 is that the postage, which was two cents per pound under the former act, was reduced by the latter act to one cent per pound. A rule was promulgated by the Postmaster General, taking effect, as I understand it, January 1, 1908 (see the Postal Laws and Regulations Pertaining to the Second Class of Mail Matter. Corrected to March 1, 1910, page 20), which is as follows:

"Sample copies of publications entered as second-class matter shall be accepted for mailing at the second-class postage rate of one cent a pound to the extent of ten per centum of the total weight of copies mailed to subscribers during the calendar year," etc.

This is the regulation referred to in the indictment, which, as has been stated, it is conceded is not of great materiality here, and is only set out in the indictment as a matter of inducement. It is unnecessary, therefore, to determine whether the regulations of the Postmaster General changing the number of sample copies which may be mailed as second-class matter at one cent a pound from 100 per cent., as was formerly the rule, to 10 per cent., as provided in the more recent rules, is a reasonable regulation and consistent with the acts of Congress of 1879 and 1885. That the Postmaster General may make rules

and regulations not antagonistic to or inconsistent with law—that is with the acts of Congress, which would be binding and effective, and in some cases, have the force and effect of law—will be readily conceded. Whether this regulation changes the law to an extent which would be beyond the power of the Postmaster General it will be unnecessary now to determine in view of what is conceded by counsel for the government.

The distinct question is, therefore, whether under the facts set out in the indictment copies of the Semi-Weekly Journal, which it was proposed to mail, and which were mailed, were entitled to the one cent per pound rate. The copies of the Semi-Weekly Journal mailed, it is not denied, and there is no charge to the contrary, were additional copies of the regular Semi-Weekly Journal. This publication had all the qualifications necessary to admit it to the mails as second-class matter, and it had been so admitted. Under the acts of 1879 and 1885, all publications of the second class (as this was) when sent from the office of publication are entitled generally to transmission through the mails at one cent a pound. The act of 1879 expressly provides that nothing therein contained "shall be so construed as to admit to the second-class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates." There is nothing whatever in the indictment that charges expressly, even if it could be construed to charge the same inferentially, any of the three requisites to exclusion from the second-class rate contained in this proviso. It does not charge that this publication was "designed primarily for advertising purposes," or that it was "for free circulation" or "for circulation at nominal rates." The only thing that is charged, so far as it can be said to hint at this matter at all, is that these papers were not to be sent to regular subscribers. It has not been contended here, as I understand it, and it certainly could not be plausibly contended, that under the acts of 1879 and 1885 papers which may be sent by the publisher from the office of publication under the second-class rate are limited to subscribers only. It is only provided "that when sent from news agencies to actual subscribers," etc., and not when sent by publishers from the office of publication.

I have been handed, by Mr. Ackerman, special assistant to the Attorney General in the prosecution of this case, a pamphlet published by authority, and containing a letter from the Third Assistant Postmaster General to Senator Bacon, with the statement by Mr. Ackerman (concurred in by defendants' counsel) that it could be properly referred to and considered as a public document by the court in this case. In his letter Hon. A. L. Lawshe, Third Assistant Postmaster General, says:

"It has long been the policy of the department, and in my opinion very properly so, to regard as a component part of a legitimate list of subscribers copies sent as bona fide gifts from one person to another, copies sent to advertisers to prove the insertion of their advertisement, and copies sent as exchanges with other publications of the second class, and copies sent as complimentary by the publisher to his friends, and there has been no change in policy in that regard where such practices are not for the purpose of forcing circulation. Furthermore, copies mailed in fulfillment of so-called campaign and political subscriptions will continue to be accepted at the publishers' usual second-class rate."

It seems perfectly clear, therefore, that there 'are many ways in which, taking the views of the Third Assistant Postmaster General in charge of these matters, publications could go through the mails to others than regular subscribers, and be entitled to the one cent a pound rate.

At another place in the publication to which I have referred, containing the letter to Senator Bacon, is an address by Mr. Lawshe, Third Assistant Postmaster General, published and issued by the Post Office Department, in which he uses this expression:

"Speaking for the Postmaster General, as well as for myself, I may say that legitimate publishers have nothing to fear from the present administration of the Post Office Department. By legitimate publishers I mean that class of publishers who conduct a clean business in a clean way, and do not attempt, by questionable practices, unlawful subterfuges, and covert methods to evade a reasonable construction of the law excluding from the pound·rate publications designed primarily for advertising purposes, for free circulation, or for circulation at nominal rates."

So that the purpose of the Post Office Department, as thus shown, is to apply the proviso to the act of 1879 and exclude from the second-class rate "publications designed primarily for advertising purposes, for free circulation, or for circulation at nominal rates." It is manifest, therefore, that, if to deprive the publisher of the right to the one cent a pound rate, it must be issued and circulated for one of the purposes named, there is no real offense charged in this indictment. It would certainly be no conspiracy to defraud, based on a scheme, which sought only to do that which the law allowed, and that is conceded by the able counsel for the government here. I think we are all agreed that if, under the facts set out in this indictment, it does not appear with reasonable certainty and clearness that this publication was not entitled to the pound rate—that is, to the rate of one cent per pound— no offense is stated under the laws of the United States. Charges of "conspiracy" and "schemes to defraud" are not sufficient unless the facts set out in connection therewith justify such charges.

I do not pass upon any of the other questions in this case, which it is unnecessary to decide. I do hold, however, that this indictment is insufficient because it fails to charge an offense under the proviso to the act of 1879; that is, that the scheme set out contemplated the sending of papers through the mails not only to others than regular subscribers, but also that they were designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates. These are the only instances under the acts of Congress in which a publication having the other requisites and admitted to the second class would violate the law by mailing under the second-class rate. In a case like this, charging a crime under section 5440 of the Revised Statutes (page 3676, U. S. Comp. St. 1901), it should not be necessary to gather the case from mere inference, but it should charge with reasonable certainty that which would constitute an offense under the law. Many authorities might be cited in support of this. In United States v. Mann, 95 U. S. 580, 583, 24 L. Ed. 531, this is said by Mr. Justice Clifford, speaking for the Supreme Court:

"Offenses created by statute as well as offenses at common law consist, with rare exceptions, of more than one ingredient, and the rule is universal

that every ingredient of which the offense is composed must be accurately and clearly expressed in the indictment or information, or the pleading will be held bad on demurrer. United States v. Cook, 17 Wall, 168 [21 L. Ed. 538]; 1 Bishop, Cr. Pro. (2d Ed.) § 81; Archb. Cr. Pl. & Ev. (18th Ed.) 54."

In Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, Chief Justice Fuller, delivering the opinion of the court, says this which is pertinent here:

"The general rule with reference to an indictment is that all the material facts and circumstances embraced in the definition of the offense must be stated, and that, if any essential element of the crime is omitted, such omission cannot be supplied by intendment or implication. The charge must be made directly and not inferentially, or by way of recital. United States v. Hess, 124 U. S. 483, 486 [8 Sup. Ct. 571, 31 L. Ed. 516]. And in United States v. Britton, 108 U. S. 199 [2 Sup. Ct. 531, 27 L. Ed. 698], it was held in an indictment for conspiracy under section 5440 of the Revised Statutes that the conspiracy must be sufficiently charged, and cannot be aided by averments of acts done by one or more of the conspirators in furtherance of the object of the conspiracy."

The attention of the court has been called to a regulation in "the Postal Laws and Regulations Pertaining to Second Class of Mail Matter" referred to above, in which it is said, in concluding a rule (page 21):

"The regular mailing of large numbers of such copies tends to show that the publication is 'designed primarily for advertising purposes or for free circulation or for circulation at nominal rates.' "

There is nothing whatever in this indictment to show that the Semi-Weekly Journal "regularly" did what they are charged with or that the defendants conspired to do so regularly. Only three instances are set out in the overt acts. This regulation seems to be notification to publishers as to what would exclude them from the second-class rate, or, at least, would cause inquiry as to whether they were entitled to it.

It clearly evidences, however, the fact that the Post Office Department will test the right to the second-class rate by the proviso to the act of 1879, which has been several times referred to, and that they will be given the second-class rate unless they come within the terms of this proviso.

I have gone over the rules and regulations of the Post Office Department and all the literature which has been handed me, and which it is agreed may be properly used in passing upon this demurrer, and it appears very clearly that the main purpose of the Post Office Department is to exclude from the second-class rate what are sometimes called "fake" publications—that is, publications designed primarily and mainly for advertising purposes or for free circulation or for circulation at nominal rates—and not to exclude well-recognized newspapers, regularly published and intended for the dissemination of news, for the discussion of current topics and intended to contain interesting reading matter, and I think it may be seriously doubted whether the proviso to the act of 1879 was intended for real newspapers of the class indicated, or to additional copies of such newspapers sent to others than regular daily, weekly, or semi-weekly subscribers. It is unnecessary to determine this latter proposition, however, because, as I have said, it certainly does not apply to additional copies of a real,

genuine newspaper unless the same were intended primarily for advertising purposes, or for free circulation, or for circulation at nominal rates.

In my judgment the indictment fails to state an offense under the law, and the demurrer to it must be sustained for the reasons above given.